Larry DUNN, Tom Duckworth, et al., Plaintiffs-Counter-defendants-Appellants,

v.

AIR LINE PILOTS ASSOCIATION, Henry Duffy, et al., Defendants-Counter-claimants-Appellees.

No. 97-5587.

United States Court of Appeals,

Eleventh Circuit.

Oct. 25, 1999.

Appeals from the United States District Court for the Southern District of Florida. (No. 91-2679-CV-EBD), Edward B. Davis, Judge.

Before TJOFLAT, DUBINA and HULL, Circuit Judges.

HULL, Circuit Judge:

A group of airline pilots allege that the Air Line Pilots Association-a labor union-libeled them by placing them on a "scabs" list. The pilots also assert that by listing them as "scabs," the union intentionally interfered with their business relationships with other airlines. The district court dismissed the tortious interference claim for failure to state a claim for relief. As for the libel claim, the court held on summary judgment that the description of the pilots as "scabs" was not false because the pilots admit they crossed union picket lines and worked during the 1989 strike of Eastern Air Lines. The district court also held there was no evidence of actual malice. We affirm.

## I. FACTS

### A. *Eastern Pilots' Sympathy Strike*

The Air Line Pilots Association ("ALPA") is a labor union that represents airline pilots from a number of commercial airlines. Within each airline, ALPA operates through a Master Executive Council ("MEC"), a board of elected pilot representatives that makes union policy decisions relating to that airline.

In early 1989, Eastern Air Lines, Inc. ("Eastern" or "EAL") reached an impasse in its negotiations with the International Association of Machinists ("IAM"), and IAM began to consider a strike. At its February

1989 meeting, the Eastern MEC adopted a formal resolution declaring the MEC's intention to direct pilots to honor IAM picket lines in the event of an IAM strike.

The Eastern MEC also directed its officers to survey the membership to measure pilot support for a sympathy strike to provide guidance to the MEC's strike deliberation. On February 16, 1989, MEC Chairman Bavis sent a letter to each Eastern pilot enclosing a copy of the MEC resolution expressing support for the IAM. The following day, the Eastern MEC sent a "ballot poll card" to each Eastern pilot. Nearly seventy-five percent of the 2,165 pilots who returned the ballot poll cards responded that they would honor IAM picket lines outright or would support the MEC's decision to call a sympathy strike.

The Eastern MEC met again on March 1, 1989. After reviewing the results of the pilot survey and conducting a last-minute telephone poll revealing even stronger pilot support, the MEC unanimously adopted a resolution "that all Eastern Air Lines pilots shall honor the International Association of Machinists picket lines and shall refuse to cross picket lines and that all pilots shall refrain from performing any work for EAL during the strike."

On March 4, 1989, the IAM struck Eastern, and ALPA commenced its sympathy strike. Over ninety percent of the approximately 3,400 Eastern pilots initially joined the sympathy strike and refused to cross IAM picket lines.

B.      "Scabs" List

Eastern encouraged pilots to cross picket lines by promising that any pilot who returned to work would receive promotions to higher-paying positions. In response, on March 28, 1989, the Eastern MEC unanimously adopted a formal resolution to "publish a finalized list of strikebreaking pilots at the conclusion of the ALPA sympathy strike" and to bring internal union charges under ALPA's constitution against ALPA members who crossed the picket lines. Individuals were placed on this list of working pilots only upon receipt of two confirmed reports that they had crossed ALPA picket lines, and after being provided with "an opportunity to refute the allegation" that they had crossed picket lines to fly for Eastern.

2

The Eastern MEC, the strike operations committee, and striking pilots repeatedly advised working pilots that the union would regard them as "scabs" if they crossed ALPA's picket lines. For example, a July 31 MEC strike committee report reminded pilots that, "[a] pilot becomes [a] scab at [the] moment he signs to go back to work ."

C.      *Pilots Vote to Continue Strike*

Meanwhile, the Eastern MEC was engaged in an internal debate about whether to continue the Eastern pilots' sympathy strike. Initially, the MEC convened on August 1, 1989, and met for five consecutive days to review the situation. Following substantial discussion, two "straw" polls of the MEC members established that a majority favored continuation of the sympathy strike; thus, the MEC unanimously adopted a resolution to continue the sympathy strike pending membership meetings at each local pilot base.

The first of these local pilot meetings was held on August 6 in Miami and broadcast to other cities. As detailed later, the parties dispute what the ALPA and Eastern MEC leadership said at this August 6 meeting about returning to work. However, it is undisputed that the August 6 meeting concluded with the Miami-based Eastern pilots voting overwhelmingly, by a show of hands, to continue the sympathy strike. Subsequent local pilot meetings yielded the same result. From August 6 to 9, ALPA held pilot meetings at communication centers throughout the Eastern system. At each meeting, with one exception, the pilots voted overwhelmingly to continue the sympathy strike.

On August 11, 1989, the Eastern MEC made an official decision to continue the sympathy strike. ALPA President Duffy notified all ALPA pilots of the MEC's decision by letter, explaining: "Over the past week ... the Eastern pilots have reviewed their options and have voted overwhelmingly not to return to work without a structured settlement of the sympathy strike." On August 12, 1989, the strike operations committee likewise confirmed that "THE STRIKE IS ON!! THE PICKET LINE REMAINS!!" The pilots' overwhelming vote to remain on strike was widely reported in the media and in internal ALPA communications.

3

On November 22, 1989, the Eastern MEC voted to end the pilots' sympathy strike, despite the fact that the IAM strike had not ended. Accordingly, the MEC made an unconditional offer—on behalf of all pilots—to return to work.

During the sympathy strike, ALPA had compiled a "scabs" list of pilots who crossed union picket lines to fly for Eastern. ALPA added the names of other crossover pilots and new hires over time. The list was available to anyone who wanted it. In 1991, ALPA produced and distributed 50,000 copies of the "scabs" list. This final publication was entitled "The Scabs of Eastern of the Strike of '89."

The Plaintiffs-Appellants in this case are all pilots who were on this list. They brought suit against ALPA,[1] alleging, *inter alia,* that the publication of the "scabs" list constituted libel and that it intentionally interfered with their business relationships with other airlines.[2] The district court dismissed the tortious interference allegation for failure to state a claim under Florida tort law.[3] The court granted summary judgment to ALPA on the libel claim, concluding that the pilots had not shown the "scabs" list was false or evidence of actual malice, as required for a libel claim.[4] The pilots now appeal these rulings.

## II. STANDARD OF REVIEW

This Court reviews *de novo* the dismissal of a complaint for failure to state a claim, construing all allegations in the complaint as true and in the light most favorable to the plaintiff. *Lowell v. American*

---

[1]The Plaintiffs-Appellants also sued certain individual executives in ALPA and in the Eastern MEC. In this opinion, we refer to all of the Defendants-Appellees jointly as "ALPA" or the "Defendants."

[2]The Plaintiffs-Appellants filed suit in Florida circuit court; ALPA removed the case to the United States District Court for the Southern District of Florida on the ground that certain of the pilots' claims (not at issue here) were governed by the federal Railway Labor Act. *See* 28 U.S.C. § 1441 (1994).

[3]The parties agree that Florida law controls this dispute except to the extent it is preempted by federal law.

[4]There was a summary judgment motion filed by ALPA and Defendants Duffy and Babbit on April 12, 1996, and a separate summary judgment motion filed by Defendants Copeland, Breen, Baldwin, and Petachenko on April 22, 1996, which incorporated the first by reference. The two motions raise nearly identical issues.

4

*Cyanamid Co.,* 177 F.3d 1228, 1229 (11th Cir.1999); *Harper v. Thomas,* 988 F.2d 101, 103 (11th Cir.1993). A complaint may not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle plaintiff to relief. *Hall v. Coram Healthcare Corp.,* 157 F.3d 1286, 1288 (11th Cir.1998); *Terry v. Cook,* 866 F.2d 373, 375 (11th Cir.1989).

Our review of a summary judgment order is also *de novo. See Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 465 n. 10, 112 S.Ct. 2072, 2081 n. 10, 119 L.Ed.2d 265 (1992); *Harris v. H & W Contracting Co.,* 102 F.3d 516, 518 (11th Cir.1996); *Carriers Container Council v. Mobile S.S. Assoc., Inc.,* 896 F.2d 1330, 1337 (11th Cir.1990). We review all evidence and all factual inferences therefrom in the light most favorable to the non-moving party.

### III. TORTIOUS INTERFERENCE CLAIM

We first consider the pilots' claim for tortious interference with business relationships. ALPA moved to dismiss the claim under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted; the district court granted the motion. *See Dunn v. Air Line Pilots Ass'n,* 836 F.Supp. 1574, 1584 (S.D.Fla.1993). The pilots challenge this dismissal.[5]

Under Florida law, the elements of an interference with a business relationship claim are: (1) the existence of a business relationship, (2) the defendant's knowledge of that relationship, (3) an intentional and unjustified interference with the relationship, and (4) injury resulting from the breach of the relationship. *See Tamiami Trail Tours, Inc. v. Cotton,* 432 So.2d 148, 151 (Fla. 1st DCA 1983), *aff'd in relevant part,* 463 So.2d 1126, 1127 (Fla.1985). A "business relationship," for purposes of the first prong, does not require the

---

[5]The pilots filed three different complaints in this suit; each complaint modified the prior complaint. The interference with business relationships claim was part of the pilots' second complaint. ALPA contends that the pilots waived their right to appeal the dismissal because after dismissal of that claim they failed to replead interference with business relationships in their third (and final) complaint. We disagree. The pilots presumably had nothing to add to their interference with business relationships claim; consequently, repleading would have been futile and would have resulted only in a second dismissal under Rule 12(b)(6). For this reason, we do not require a party to replead a claim following a dismissal under Rule 12(b)(6) to preserve objections to the dismissal on appeal. *See Wilson v. First Houston Inv. Corp.,* 566 F.2d 1235, 1237-38 (5th Cir.1978), *vacated on other grounds,* 444 U.S. 959, 100 S.Ct. 442, 62 L.Ed.2d 371 (1979).

existence of a contractual agreement. *See id.* It does, however, require a relationship with a particular party, and not just a relationship with the general business community. *See Ethan Allen, Inc. v. Georgetown Manor, Inc.,* 647 So.2d 812, 815 (Fla.1994). In their complaint, none of the pilots alleged the existence of a business relationship with a particular airline. They instead alleged that ALPA's publication of the scab list prohibited them from obtaining employment with any commercial airline-in other words, that it interfered with the pilots' ability to sell their labor to the general community. Such an allegation is insufficient to state a claim for intentional interference with a business relationship; we therefore affirm the district court's dismissal of this claim.

## IV. LIBEL CLAIM

Turning to the pilots' libel claim, we initially discuss applicable Supreme Court precedent and why the "scabs" list was not false. We next explain why the district court correctly held that the 1989 strike was lawfully called and why ALPA's interpretation of its governing rules is entitled to judicial deference. Finally, we address the lack of evidence of actual malice.

*A.     Supreme Court Precedent*

Under Florida law, libel is defined as the unprivileged written publication of false statements that cause injury. *See Delacruz v. Peninsula State Bank,* 221 So.2d 772, 775 (Fla. 2d DCA 1969). However, the Supreme Court has instructed that federal labor law partially preempts state libel law because national labor policy favors free speech, open communication, and robust debate in labor disputes. *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 273, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Linn v. United Plant Guard Workers Local 114,* 383 U.S. 53, 57-58, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). Therefore, when published in the context of a labor dispute, a defamatory statement concerning a plaintiff is actionable only if a plaintiff shows the statement was made with actual malice. *Linn,* 383 U.S. at 65, 86 S.Ct. 657 (applying malice requirement to statements made during union organizing campaign); *Letter Carriers,* 418 U.S. at 273-281, 94 S.Ct. 2770 (interpreting *Linn* to apply to all labor disputes).

To show "actual malice" a plaintiff must establish by clear and convincing evidence that the speaker made the statement " 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " *Letter Carriers,* 418 U.S. at 281, 94 S.Ct. 2770 (quoting test adopted by analogy from *New York Times v. Sullivan,* 376 U.S. 254, 280, 285-86, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (setting out standard for First Amendment restrictions on state defamation law and stating that plaintiff bears the burden of proving actual malice with "convincing clarity")); *see also Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (clarifying that *New York Times* requires "clear and convincing proof" of actual malice). In addition, "[b]efore the test of reckless or knowing falsity can be met, there must be a false statement of fact." *Letter Carriers,* 418 U.S. at 284, 94 S.Ct. 2770. Thus, a defamation claim escapes labor-law preemption only if (1) there is a false statement of fact; and (2) the plaintiff proves actual malice by clear and convincing evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (explaining how *New York Times* 's requirement of clear and convincing proof affects the court's inquiry and presents a formidable obstacle at summary judgment).

The Supreme Court has emphasized that the epithet "scab" is "commonplace" in labor disputes and is a factual allegation that will support a libel claim but only if false and made with actual malice. *Linn,* 383 U.S. at 60-61, 86 S.Ct. 657; *Letter Carriers,* 418 U.S. at 282, 94 S.Ct. 2770. Indeed, the Supreme Court's *Letter Carriers* decision involved a "scab" defamation suit where the Court explained that "the only factual statement in the disputed publication is the claim that appellees were scabs." *Letter Carriers,* 418 U.S. at 285, 94 S.Ct. 2770. The Supreme Court examined the context in which "scabs" was used and held that naming the appellees as "scabs" was factually true and therefore appellees' claims failed, stating:

> Rather than being a reckless or knowing falsehood, naming the appellees as scabs was literally and factually true. One of the generally accepted definitions of "scab" is "one who refuses to join a union," Webster's Third New International Dictionary (unabridged ed.1961), and it is undisputed that the appellees had in fact refused to join the Branch.

7

*Id.* at 282-83, 86 S.Ct. 862. In *Letter Carriers,* there was not even a union organizing campaign, much less an ongoing strike or work stoppage. Yet, the Supreme Court held that the description "scabs" was not false even where used in the context of a union's simply gathering supporters.[6]

In *Letter Carriers,* the Supreme Court further explained that falsity in a libel case must be examined from the perspective or understanding of the reader. The Supreme Court followed the reasonable reader approach developed earlier in *Greenbelt Cooperative Publishing Association v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). In *Bresler,* the defendants had characterized the position of the plaintiff in certain negotiations as "blackmail," and at trial, the plaintiff had recovered damages for libel on the theory that defendants knew he had committed no such criminal offense. The Supreme Court reversed, holding that this use of the word "blackmail" should not be legalistically construed as the commission of the criminal offense of "blackmail" but the way a reader would have reasonably perceived the word. In *Letter Carriers,* the Supreme Court quoted Justice Stewart's reasoning in *Bresler:*

> It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense.

*Letter Carriers,* 418 U.S. at 285-86, 94 S.Ct. 2770 (quoting *Bresler,* 398 U.S. at 14, 90 S.Ct. 1537). Applying this reasoning in *Letter Carriers,* the Supreme Court found a reasonable reader of the union's use of the term

---

[6]As noted by the dissent, the piece of trade union literature, entitled "Ode To A Scab," was on the front cover of the scab list in this case entitled "The Scabs of Eastern Of The Strike of '89." Although the Supreme Court in *Letter Carriers* held the epithet "scab" is a factual allegation that will support a libel claim if false and made with actual malice, the Court clarified that the pejorative definition of what a "scab" is in Jack London's "Ode To A Scab" was "rhetorical hyperbole" and was entitled to protection under the federal labor laws. 418 U.S. at 285-86, 94 S.Ct. 2770. The Court explained "[b]efore the test of reckless or knowing falsity can be met, there must be a false statement of fact...." *Id.* at 284, 94 S.Ct. 2770. However, according to the Court, the rhetoric in "Ode To A Scab" was "obviously used here in a loose, figurative sense to demonstrate the union's strong disagreement with the views of the workers who oppose unionization" and was not a representation of fact. *Id.* The Court further noted that Jack London's definition of a scab "has become a familiar piece of trade union literature; according to undisputed testimony in this case it has been published countless times in union publications over the last 30 years or more." *Id.* at 286, 94 S.Ct. 2770.

"traitor" would not understand the union "to be charging the appellees with committing the criminal offense of treason."  418 U.S. at 285, 94 S.Ct. 2770.

The reasonable reader approach has been followed consistently by the Supreme Court and this Circuit. *See Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 515, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (inquiring into "the meaning a statement conveys to the reasonable reader" and explaining that a "statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' ") (quoting R. Sack, *Libel, Slander, and Problems* 138 (1980));  *Keller v. Miami Herald Pub. Co.,* 778 F.2d 711, 716 (11th Cir.1985) ("Appellant's strictly literal interpretation ignores the nature of a cartoon and how cartoons are traditionally understood by those who view them:  '[Such an] interpretation does not construe [the cartoon] as the common mind would understand [it] but is tortured and extreme.' *Valentine v. C.B.S., Inc.,* 698 F.2d 430, 432 (11th Cir.1983) (per curiam).").

B.     *"Scabs" List Was Not False*

Applying this precedent, we examine whether the "scabs" list was false.  In assessing falsity, we place the "scabs" list in the context of the above undisputed events surrounding the 1989 strike and interpret the "scabs" list from the perspective or understanding of the reasonable reader.

As in *Letter Carriers,* our initial step is to examine the commonly understood definitions of "scab" and "strike."  The pertinent definition of "scab" for this case is "one who refuses to strike or returns to work before a strike has ended."[7]  Likewise, the commonly understood definition of "strike" in a labor context is "a temporary stoppage of work by a body of workers designed to enforce compliance with demands (as

---

[7]The various definitions of a "scab" in the labor context are:  "(1):  one who refuses to join a union (2): a member of a union who refuses to strike or returns to work before a strike has ended (3):  a worker who accepts employment or replaces a union worker during a strike (4):  one who works for lower wages than or under conditions contrary to those prescribed by a union."  Webster's Third New International Dictionary 2022 (1986).  The definitions quoted are from the 1986 version of the dictionary, which was the current version when the "scabs" list was published in 1991.  The definitions remain unchanged in the 1993 version of the same dictionary.  *See* Webster's Third New International Dictionary 2022 (1993).

changes in wages, hours, or working conditions) made on an employer."[8] It is undisputed that the 1989 sympathy strike was designed to enforce compliance with such demands.

Thus, under the undisputed facts here, a reasonable reader of ALPA's list of "The Scabs of Eastern of the Strike of '89" would interpret it as a list of those pilots who crossed the union's picket lines and worked during the 1989 work stoppage. Because these pilots admit they crossed picket lines to work during that 1989 work stoppage, ALPA's listing them as "scabs" was factually true and the district court correctly granted summary judgment on their libel claims for failure to show falsity.[9] No reasonable jury could find otherwise.

The pilots argue that ALPA was never legitimately on strike because it failed to conduct a formal secret ballot of its membership as required by ALPA's Constitution and By-Laws. Contending the strike was illegally called, the pilots assert that there was no valid strike, that they cannot be considered to have worked when their union was striking, and thus that they cannot be considered as "scabs."

The pilots argue that falsity should be assessed in this case based on the technical, legalistic definition of "strike" and whether this "strike" was called legally under ALPA's Constitution and By-Laws. Their argument, however, misses the whole point of *Letter Carriers, Linn,* and *Bresler*'s mandates to consider the surrounding circumstances and reasonable understanding of the supposedly defamatory remarks and not the strictly legalistic or literal interpretation of the words used. It is undisputed that the strike called by ALPA's leadership resulted in a massive union work stoppage; that there were union picket lines; that as many as ninety percent of Eastern pilots refused to fly for Eastern initially; that a strike committee was set up and local communication centers were operating; that Plaintiffs returned to work during that work stoppage; and that the majority of pilots actually supported and voted overwhelmingly to continue ALPA's

---

[8]Webster's Third New International Dictionary 2262 (1986).

[9]The district court ruled that "the listing of the Plaintiffs on the scab list either is not a matter of fact, or is indeed factually correct. By common parlance, a 'scab' is 'one who works for less than union wages or on nonunion terms.'" 836 F.Supp. 1575, 1581 (S.D.Fla.1993) (citing Webster's New Collegiate Dictionary 1021 (1979)). Because all Plaintiffs crossed picket lines, the district court further held that all Plaintiffs "crossing a picket line during a sympathy strike constitutes working on nonunion terms." *Id.*

leadership's called work stoppage. Even though the pilots now contend that ALPA's leadership should have had a full membership vote by secret ballot first, it is undisputed that its union pilots actually struck Eastern and a massive work stoppage occurred. As a reasonable reader would have understood, a "scab" of "Eastern of the Strike of '89" was a person who returned to work during the well-publicized 1989 pilots' massive work stoppage designed to enforce compliance with demands made on an employer. The truth or falsity of the label "scab" turns not on a highly formalistic, legal analysis of the validity of the strike itself under ALPA's constitution but on a reasonable reader's perception of this work stoppage as a "strike." Thus, ALPA's describing Plaintiffs as "scabs" was not false.

Supreme Court precedent explicitly supports this conclusion. In *Letter Carriers,* addressing a union's allegation that the plaintiffs were guilty of "treason," the Supreme Court explicitly explained that the union's charge was not "false" merely because the plaintiffs were not guilty of "treason" in the technical sense. 418 U.S. at 285-86, 94 S.Ct. 2770. Likewise, in *Bresler,* the Court explained that an allegation that the plaintiff had committed "blackmail" should be read in context as a statement that the plaintiff's bargaining position was unreasonable-not an accusation that the plaintiff had actually committed the criminal offense of blackmail. 398 U.S. at 14, 90 S.Ct. 1537.

Similarly, ALPA's listing of these pilots as "scabs" during the 1989 strike was not an accusation that ALPA's leadership called the sympathy strike in the strict, legal manner provided for under its Constitution and By-Laws, its Administrative Manual, and its other rules. Instead, placing these pilots on the "scabs" list was an allegation that they worked during the union's called work stoppage and was factually true. A reasonable reader would understand the pilots on ALPA's "scabs" list to be the pilots who returned to work across union picket lines during the 1989 work stoppage.[10] In assessing falsity of "scabs" in this libel suit,

_____

[10]It strains credulity, as suggested by the dissent, that in the face of the massive work stoppage of 1989, the picketing, the polls of the pilots in favor of the strike, and the communications from ALPA about the ongoing nature of the strike that a reasonable reader would infer the suggestion of a strike called in strict conformance with ALPA's constitution simply because it was a union that used the term "scab." Additionally, there is no evidence in this record that any ALPA member during the course of the 1989 strike sought an

11

how a labor strike must be called under a particular union's constitution, by-laws, and rules, and whether this labor strike was legally called thereunder are simply not part of the generally accepted definitions of a "scab" or a "strike" that inform the analysis in a libel claim-much less a part of the reasonable reader's concern in reading the 1989 "scabs" list.[11]

C.      *Strike Was Lawfully Called*

In any event, the district court correctly held that ALPA's 1989 sympathy strike was lawfully called. ALPA's constitution does provide that members "will be balloted" before a "suspension of service" and that

---

injunction to halt the strike as illegally called under ALPA's constitution, but instead ALPA's pilots overwhelmingly voted to support the strike and actually struck Eastern.

[11]We found no published case applying *Letter Carriers* where defamation liability was imposed based on a "scab" allegation during an admitted labor dispute-much less on the dissent's novel theory that even though a strike occurred, the lack of a validly called strike renders a "scab" allegation false as a matter of law. The truth of the "scabs" list depends not on the legal validity of the strike but upon the reader's perception of the existence of a labor dispute, such as a strike, and of whether Plaintiffs-Appellants opposed the union during the labor dispute, such as by returning to work across union picket lines. As quoted above, the commonly understood definition of a strike is not a legalistic definition but is "a temporary work stoppage by a body of workers designed to enforce compliance with demands ... made on an employer." *See* footnote 7 *infra.*

12

the majority vote of the MEC is required before "a strike vote of the members."[12]  This provision is general and does not distinguish between primary strikes and sympathy strikes.

However, ALPA's constitution also (1) vests its Board of Directors with authority to control and manage the business affairs of ALPA;  (2) charges the Board with the authority to interpret and apply the terms of ALPA's constitution;  and (3) provides that in the event of any dispute about the intent or meaning of its constitution, the Board's interpretation of the constitution shall govern.[13]  ALPA's Board is also authorized to develop internal ALPA policies, which are contained in its Administrative Manual and are

---

[12]ALPA's Constitution provides in Article I:

> SECTION 25—SUSPENSION OF SERVICE
>
> When a suspension or withdrawal of service is called for in compliance with the requirements of the Constitution and By-Laws or the Policy Manual, the members will be balloted before such action may be taken.  Association general balloting procedures will be used.

Article IV, Section 2(B), provides:

> SECTION 2—JURISDICTION AND DUTIES OF MASTER EXECUTIVE COUNCIL
>
> B. The approval by a majority vote of the Master Executive Council on an airline with the advice of the President [of ALPA] is mandatory before a strike vote of the members of an airline may be taken.  This membership strike vote shall be by secret ballot....  A simple majority of valid ballots returned shall govern.

[13]Article VII, Section 2, provides:

> SECTION 2—JURISDICTION AND DUTIES
>
> The Board of Directors is the highest governing body of the Association.  It shall be vested with the control of the Association, its general management and business affairs.  Its decision, whether rendered by ballot or in session, shall be the final governing decision of the Association and shall be binding on the Executive Board, the Executive Committee, the Officers, and all members of the Association, subject to action of the Executive Board pursuant to Article V, Section 2, of this Constitution and By-Laws.  The Secretary of the Association shall ballot the Board of Directors on any issue when petitioned by fifteen percent (15%) of the Board of Directors.  In the event of any dispute arising out of the meaning or intent of these Constitution and By-Laws, the Board of Directors shall have the power to interpret the Constitution and By-Laws and such interpretation shall govern the Association in the conduct of its business and affairs.

13

binding on all ALPA members.  In particular, a section entitled "Strike Policy" in that Manual gives the MEC

authority to declare a sympathy strike:

> D. PICKET LINES IN THE EVENT OF A STRIKE SOURCE—Board 1966;  AMENDED—Board 1986
>
> 1. *The decision to honor or not honor picket lines of other crafts shall be left to the discretion of the President and the MEC of the carrier involved.*
>
> 2. No ALPA member shall cross another ALPA member's picket line in order to do struck work.

ALPA Administrative Manual, Part 4, Section D (emphasis added).

This Strike Policy has remained essentially unchanged since 1966.  The unrebutted evidence in this

case shows that for the past thirty years ALPA consistently has applied its constitution and this Strike Policy

in the same manner as it did during the Eastern ALPA sympathy strike and has called sympathy strikes

without a membership vote first.[14]  The general language of this ballot provision has been interpreted by

---

[14]As Seth Rosen, ALPA's long-time Director of Representation, stated:

> In my employment with ALPA over the last 25 years, I have been involved in or had close personal knowledge of a number of occasions on which ALPA decided to engage in sympathy strikes.  In particular, I have personal knowledge of the following occasions on which ALPA decided to engage in sympathy strikes:

| Year | Air Carrier | Primary Strike By |
|------|-------------|-------------------|
| 1971-72 | Hughes Air Corp. d/b/a Air West | Aircraft Mechanics Fraternal Ass'n |
| 1973 | Ozark Air Lines | Aircraft Mechanics Fraternal Ass'n |
| 1974 | Saturn Airways | Int'l Bhd. ofTeamsters |
| 1977 | Trans Int'l Airlines | Int'l Bhd. ofTeamsters |
| 1979 | Ozark Air Lines | Ass'n of FlightAttendants |
| 1985 | Pan American World Airways | Transport Workers Union |

> To the best of my knowledge, on none of the above listed occasions was a vote of ALPA members taken for the purpose of authorizing the decision to engage in a sympathy strike.  Indeed, *I am not aware of any occasion on which a vote of ALPA members was conducted for the purpose of authorizing a sympathy strike.*

14

ALPA's Board for thirty years to apply to only primary strikes and not to secondary strikes, also known as sympathy strikes.[15]

The district court correctly held that ALPA's longstanding interpretation of its own governing documents is entitled to considerable judicial deference, subject to judicial review only if "patently unreasonable" or adopted in bad faith. *See Dow v. United Bhd. of Carpenters and Joiners,* 1 F.3d 56, 58 (1st Cir.1993); *Local 1052 United Bhd. of Carpenters & Joiners v. Los Angeles County Dist. Council of Carpenters,* 944 F.2d 610, 613 (9th Cir.1991); *Air Wisconsin Pilots Protection Comm. v. Sanderson,* 909 F.2d 213, 218 (7th Cir.1990); *Newell v. International Bhd. of Elec. Workers,* 789 F.2d 1186, 1189 (5th Cir.1986). Judicial deference is particularly appropriate in this libel case where ALPA's interpretation is

---

(emphasis added). In contrast, Mr. Rosen stated that ALPA's general practice has been to ballot members only prior to conducting a *primary* strike.

[15]J. Randolph Babbitt, the current president of ALPA, testified at his deposition:

It is our practice here for a primary strike to follow the procedures set forth in the Constitution and Bylaws. It is equally our practice, if there is a secondary strike, there is specific language that directs us in the Policy Manual to a different set of procedures and we would follow those.

John Bavis, who had twenty-four years of experience at ALPA and is a former chairman of the Eastern MEC, similarly testified at his deposition:

If what you are asking me is did we actually do a strike vote of the membership under paragraph B, my answer to you is no. However, the authority and duty to [sic] the MEC is contained in all of this section. And B talks about a primary strike, which could be the pilots' own strike on the property. It is silent here in this particular section you're talking about dealing with the question about a secondary strike. You have to go to the Administrative Manual to find out what the process is to follow. And when you do that, it says in words to the effect that the president in conjunction with the MEC is the decision-making factor to honor another craft's picket line on your property. It takes both of those constituent bodies to agree.

...

The literal words say strike vote of the members of airlines may be taken. It refers to a primary strike on the property. Even though the word primary isn't there, that is the intent of the particular paragraph.

consistent with its well-established past practices for sympathy strikes, where most pilots participated in the leadership's called strike, where the pilots subsequently voted overwhelmingly in August 1989 to continue the strike, and where ALPA's constitution provides that the Board's interpretation shall govern in the event of dispute. The district court correctly deferred to ALPA's interpretation of its governing documents. Even if ALPA's interpretation were somehow incorrect, the record contains no evidence that ALPA's thirty-year interpretation is patently unreasonable or that it was adopted in bad faith.[16]

In sum, we find that the pilots have not shown that ALPA's sympathy strike was unlawfully called. At a minimum, there is insufficient evidence that ALPA's interpretation of its constitution is patently unreasonable or adopted in bad faith.

D.      *No Jury Issue Regarding Actual Malice*

Independently of the above reasons, all Defendants are also entitled to summary judgment on the libel claim because the pilots have produced insufficient evidence of "actual malice." Indeed, the evidence establishes that Defendants reasonably believed these pilots were "The Scabs of Eastern of the Strike of '89" because they undisputedly crossed ongoing picket lines during the sympathy strike. At a minimum, the record is devoid of evidence to support a jury finding that the pilots proved by clear and convincing evidence that Defendants knew-or were reckless about whether-they were "The Scabs of Eastern of the Strike of '89." Similarly lacking is any evidence that Defendants knew or were reckless about whether readers would strictly construe the terms "scabs" and "strike" according to technical definitions rather than the common understanding of workers who cross picket lines during a work stoppage.

---

[16]The dissent describes ALPA's interpretation as "simply ridiculous" and "implausible." There are common sense arguments why union members would want a membership vote for all types of strike. However, the question here is not what we think is best or what pilots likely would insist upon before a sympathy strike is called. Instead, the question is what actually happened in this case and whether this Court should defer to ALPA's interpretation of its own constitution under the specific uncontested facts in this record.

16

The inquiry in a case involving actual malice is not whether the defendants acted negligently or imprudently in publishing the challenged statements. *See Masson,* 501 U.S. at 510, 111 S.Ct. 2419; *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Rather, a defamation plaintiff must establish that a defendant acted with a "high degree of awareness of ... probable falsity" of factual statements or in fact "entertained serious doubts as to the truth of his publication." *Masson,* 501 U.S. at 510, 111 S.Ct. 2419 (citations omitted); *St. Amant v. Thompson,* 390 U.S. at 731, 88 S.Ct. 1323; *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *accord Harte-Hanks Communications v. Connaughton,* 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *Bose Corp. v. Consumers Union,* 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

This actual-malice standard requires a plaintiff to establish by clear and convincing evidence, *Masson,* 501 U.S. at 510, 111 S.Ct. 2419; *Anderson,* 477 U.S. at 254, 106 S.Ct. 2505, that "the defendant realized that his statement was false or that he subjectively entertained serious doubt as to [its] truth." *Bose,* 466 U.S. at 511 n. 30, 104 S.Ct. 1949; *see Holbrook v. Harman Automotive, Inc.,* 58 F.3d 222, 226 (6th Cir.1995); *Clyburn v. News World Comm. Inc.,* 903 F.2d 29, 33 (D.C.Cir.1990).[17]

Here, there is no evidence, let alone sufficient evidence to meet the clear and convincing standard, that Defendants subjectively believed the strike was illegally called and therefore it would be inaccurate to describe the pilots as "scabs." First, it is important to note the parties have never suggested that anyone contested the legality of the strike while it was ongoing. Each individual Defendant testified that he considered the pilots who crossed ALPA's picket lines to be "scabs" because they abandoned the ALPA sympathy strike, took the jobs of striking pilots, and sided with Eastern during the strike. These ALPA officials also testified, without contradiction, that they in fact believed that the Eastern MEC and ALPA's

---

[17]Ill-will, improper motive or personal animosity plays no role in determining whether a defendant acted with "actual malice." *See Masson,* 501 U.S. at 510, 111 S.Ct. 2419 ("Actual malice ... should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."); *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 52 n. 18, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (same).

President properly authorized the pilot sympathy strike pursuant to ALPA's Strike Policy. Given ALPA's thirty-year-old written policy and consistent practice of initiating sympathy strikes without a formal membership vote, and given that the majority of the pilots actually struck against Eastern, participated in a massive work stoppage, and later voted in favor of continuing the strike, there is no evidence that the ALPA Defendants entertained serious doubts about whether these pilots were accurately described as "scabs." Therefore, we affirm the district court's summary judgment order on the libel claim because the pilots failed to show both a false statement and actual malice.

E.      *Pilots Who Flew for Eastern Only After August 6*

The district court also correctly rejected the separate argument made by a group of pilots who crossed the union picket lines only after the union meeting on August 6 (the "post-August 6 crossover pilots").[18] These pilots contended that they could not be described accurately as "scabs" because even if ALPA's leadership legally called the sympathy strike on March 3, 1989, MEC Chairman Bavis instructed them "to return to work" on August 6, 1989.

The audiotape of the August 6 meeting shows that Bavis prefaced certain remarks by stating that he was "[s]peaking just as Jack Bavis, the pilot," not as "your elected representative[ ]," and that Bavis and every other speaker at the August 6 meeting emphasized that the Eastern pilot group had to maintain its unity and abide by the decision of the majority. Such personal opinions in the course of a debate do not remotely

_____

[18]Plaintiffs divide themselves into three groups by dates. Plaintiffs in Group III never honored the ALPA picket lines and worked throughout the strike. Plaintiffs in Group II crossed ALPA's picket lines between March 4, 1989, and August 6, 1989. Groups II and III allege only that they were defamed by being placed on the "scabs" list because no membership strike vote was taken, rendering ALPA's sympathy strike invalid and illegal.

In contrast, Plaintiffs in Group I crossed ALPA's picket lines only after the Miami-based pilots' meeting on August 6, 1989. The Group I Plaintiffs allege that they did not cross IAM's picket lines until told to return to work on August 6 by officers of Defendant ALPA and the Chairman of the Eastern MEC. Thus, even if the sympathy strike was validly called initially, the Group I Plaintiffs make the additional argument that the union leadership acted with actual malice toward them by calling them "scabs" after telling them to return to work on August 6, 1989.

18

constitute official "instructions" to break ranks and cross picket lines to return to work on an individual basis. As the audiotape of the August 6 meeting also shows, Bavis made plain that "I'm not going to go back to work personally, unless we all go back to work in the cockpit.... I'm not gonna go back to work and cross the picket line." "[R]egardless of what the outcome is in terms of the decisions we make as a group," Bavis explained, "we've made them as a group coming out, we make them as a group going back."

Despite the existence of this audiotape, a jury issue still exists about what Bavis actually said at the August 6 meeting because the audiotape was not an official recording of the meeting and seventeen pilots filed affidavits stating that Bavis urged pilots to return to work at the August 6 meeting.[19]

However, even though a jury issue exists about what Bavis actually said on August 6, there is no question of fact about what actually happened after that August 6 pilot meeting. It is undisputed that from then until November 22, 1989, the work stoppage continued, Eastern pilots in uniform continued to walk picket lines, the sympathy strike continued, and the pilots continued to cross picket lines and to work. Indeed, it is not disputed that throughout the rest of August 1989, ALPA, the Eastern MEC, and the Eastern MEC's strike operations committee repeatedly instructed all pilots to remain on strike. Between August 6 and August 9, the Eastern MEC and the overwhelming majority of the pilot group also voted to continue the strike. ALPA and the Eastern MEC notified every Eastern pilot of this decision. ALPA President Duffy notified all ALPA pilots by letter of the MEC's decision. As Duffy explained:

> Over the past week ... the Eastern pilots have reviewed their options and have voted overwhelmingly not to return to work without a structured settlement of the sympathy strike.

---

[19]The dissent points to an ALPA newsletter and charges preferred against Bavis as evidence of what was said at the August 6 meeting. However, the newsletter and the charges were not contemporaneous with any confusion about the strike that may have occurred in the meeting on August 6, 1989. Instead, the newsletter was published in 1992, and the charges were in December 1989-both well after the official conclusion of the strike on November 22, 1989.

On August 12, 1989, the strike operations committee likewise confirmed that "THE STRIKE IS ON!! THE PICKET LINE REMAINS!!" The record contains evidence of how the pilots' overwhelming vote to remain on strike was widely reported in the media and in internal ALPA communications.

Accordingly, by August 12, 1989, both the Eastern MEC and the overwhelming majority of Eastern pilots had voted to continue the pilots' sympathy strike. Both the Eastern MEC and ALPA notified all Eastern pilots that ALPA and the MEC had considered and rejected the option of terminating the strike. From August 12, 1989 until the end of the sympathy strike in November 1989, the Eastern MEC continued to direct all pilots to maintain the picket lines, and, more importantly, Eastern pilots continued to walk the picket lines in their Eastern uniforms.

As outlined above, the test is not what these post-August 6 crossover pilots thought but what Defendants subjectively knew. The test is not whether these pilots thought they were instructed to return to work and whether they thought the strike was over, but whether Defendants included the post-August 6 crossover Plaintiffs on the "scabs" list knowing the strike had ended on August 6. These pilots cannot show the Defendants knew the strike had been terminated because it is undisputed that after August 6, the work stoppage continued and Eastern pilots picketed until November 22, 1989. More importantly, even if these pilots took Bavis's remarks to be official instructions from ALPA to return to work, their subjective impression that they had ALPA's consent to cross pilot picket lines does not establish actual malice. It is Defendants' subjective view, not the pilots', that determines whether the "scabs" list issued with actual malice.

We also disagree that actual malice is shown because ALPA knew that many pilots returned to work after August 6 and that ALPA's failure to consider the practical effect of Bavis's statements on these pilots may constitute reckless disregard of the truth. Bavis's statements did not occur in a vacuum but as part of a series of ongoing events. Shortly after the August 6 meeting, the vast majority of pilots voted to continue the strike, and on August 12, the union unequivocally announced, "THE STRIKE IS ON!!" Thus, any practical effect of Bavis's statements lasted only until August 12. These particular pilots continued to work

20

after August 12 through the end of the strike in November, and no reasonable jury could find the strike still appeared to be over after August 12-much less that Defendants were reckless about such appearance.

Thus, the post-August 6 crossover pilots have failed to present any evidence from which a reasonable juror could conclude that the ALPA Defendants believed it was false to refer to them as "scabs." At a minimum, there is insufficient evidence to establish actual malice by clear and convincing evidence.

## V. APPELLANT NORMAN

Appellant Joseph S. Norman, II, advances pro se an additional argument that ALPA acted with malice as to him.[20] According to Norman, he crossed the picket lines to participate in Eastern's pilot training program, not to work as a pilot. Consequently, Norman argues that he never "worked" in violation of the strike and thus was not a scab. He cites a case holding that trainee pilots are not "permanent employees" for purposes of the Railway Labor Act. *See Eastern Air Lines, Inc. v. Air Line Pilots Ass'n Int'l,* 920 F.2d 722, 727 (11th Cir.1990).

Norman's contentions lack merit. The record shows that Norman was hired by Eastern as a DC-9 Captain and received compensation while in training. One of his job requirements was to participate in the pilot training program. Under these circumstances, Norman was "working" for Eastern in the ordinary sense of the term. It is this colloquial use of "working"—and not Norman's legal classification under the Railway Labor Act—that is relevant in determining whether "scab" can be applied to him. Consequently, ALPA had

---

[20]Norman also contends that he was not served with ALPA's motion for summary judgment at least ten days before the hearing thereon, as required by Fed.R.Civ.P. 56(c). *See United States v. One Colt Python .357 Cal. Revolver,* 845 F.2d 287, 289 (11th Cir.1988). The record, however, establishes that the required notice was served upon Norman's counsel nine months prior to the hearing. The fact that Norman subsequently began proceeding pro se—after service upon his counsel but prior to the district court's ruling on the motion—does not invalidate the notice served while he was represented by counsel and thus does not necessitate a second service.

21

no additional reason to know that Norman was not a scab; his situation is therefore no different from that of all the other pilots[21] who worked despite the strike.[22]

## VI. CONCLUSION

For these reasons, we affirm the district court's grant of summary judgment in favor of all Defendants on all Plaintiffs' libel claims and affirm the dismissal of Plaintiffs' claim for intentional interference with their business relationships.

AFFIRMED.

TJOFLAT, Circuit Judge, concurring in part and dissenting in part:

"Scab" in the labor context is a pejorative term that frequently carries with it the threat of harm. *See* John P. Ludington, Annotation, *Defamation: Designation as Scab,* 65 A.L.R.4th 1000, 1009-10 (1988).[1]

---

[21]Norman began working for Eastern in May 1989, and thus is not among the pilots who returned to work after August 6, 1989.

[22]In light of this conclusion, we can also conclude that the district court did not abuse its discretion in denying Norman's motion for severance.

[1]The Oxford English Dictionary's (the "OED") contains a compilation of the uses of the word scab in a labor context. The first known use occurred in 1777, "[t]he Conflict would not been [sic] so sharp had not there been so many dirty Scabs; no Doubt but timely Notice will be taken of them." *Oxford English Dictionary* 550 (1989). Other uses of the term scab the OED cites: "[t]he offending member was then termed a scab and wherever he was employed no others of the society were allowed to work;" "[t]he man who takes the place of another when that other engages in a struggle with a corporation is a 'scab';" "[t]he scabs soon found out what it was like to be hated;" "Having thus given the characteristics and conditions of the 'legal,' or honourable trade, I next turn my inquiry to the state of the labouring men, women, and children employed by the shop-masters, who are distinguished from the 'wages' (or legal) shops by the terms '*illegal,*' '*scab,*' or '*slaughtershop* ' *keepers;* " "If there is a strike ordered I will be damned if I am going to scab;" and "I won't scab any man's job." *See id.* (citations omitted).

Probably the most famous use of the term scab is from a poem generally attributed to Jack London entitled "Ode to a Scab," which appeared on the cover of the Air Line Pilots Association ("ALPA") publication:

After God had finished the rattlesnake, the toad, and the vampire, He had some awful substance left with which he made a SCAB. A SCAB is a two-legged animal with a corkscrew soul, a water-logged brain, and a combination backbone made of jelly and glue. Where others have hearts, he carries a tumor of rotten principles.

22

William West discovered exactly what kind of harm when he decided not to join his fellow Teamsters in striking United Parcel Service ("UPS") during the summer of 1997. Mr. West's daughter, Callie, was five years old at the time and suffered from epilepsy and kidney problems. She had already undergone twelve operations. Because West did not strike, the Teamsters, who controlled his medical insurance, cut off Callie's medical coverage. *See Union Casualties,* Wall St. J., Sept. 2, 1997, at A18.

Rod Carter, a Miami-based UPS driver and Teamster, also discovered what it meant to be labeled a scab during the 1997 strike. While stopped at a traffic light, Carter was pulled from his delivery truck by six men, beaten, repeatedly called "nigger," and stabbed five times with an ice pick. *See Hearing on S.230: The Freedom from Union Violence Act Before the Senate Judiciary Comm.,* 105th Cong., at 100-01 (1997) (testimony of Rod Carter). Retaliation against scabs that summer even extended into sympathetic unions. In Houston, the president of the Police Patrolmen's Union, Terry Martin, told his members to "go into a 'zero tolerance' mode, and do everything possible to get that UPS 'scab' truck off the road." Stephen Johnson, *Police Union Urges Members to Pull Over "Scab" UPS Drivers,* Hous. Chron., Aug. 7, 1997, at 1.

Lest one think the Teamsters are the only union that harms scabs, here are two other examples. During a United Auto Workers strike in Winchester, Virginia, striking workers vandalized the property of a woman they targeted a scab, fired a gun through her car window, and left a bloody cow's head on the hood of her car. *See Hearing on S.230: The Freedom from Union Violence Act Before the Senate Judiciary Comm.,* 105 th Cong., at 4 (1997) (testimony of Reed Larson). Finally, in the midst of a United Mine Workers

---

When a SCAB comes down the street, men turn their backs and angels weep in heaven, and the devil shuts the gates of hell to keep him out. No man has a right to SCAB as long as there is a pool of water deep enough to drown his body in, or a rope long enough to hang his carcass with. Judas Iscariot was a gentleman compared with a SCAB. For betraying his Master, he had character enough to hang himself. A SCAB HASN'T!

Esau sold his birthright for a mess of pottage. Judas Iscariot sold his Savior for thirty pieces of silver. Benedict Arnold sold his country for a promise of a commission in the British Army. The modern strike-breaker sells his birthright, his country, his wife, his children, and his fellow-men for an unfulfilled promise from his employer, trust or corporation.

strike, striking miners shot and killed Eddie York for continuing to work even though the company he worked for was not the target of the United Mine Workers strike. *See id.*

As these examples illustrate, in the labor context, scab is a factual allegation with a specific definition and consequences. *See Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin,* 418 U.S. 264, 284, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745 (1974) [hereinafter *Letter Carriers* ] (stating that "the only factual statement in the disputed publication is the claim that appellees were scabs"). If this allegation is false and made with actual malice, like any other factual assertion, it is defamatory. *Cf. id.* at 283, 94 S.Ct. at 2780 (finding that "[r]ather than being a reckless or knowing falsehood, naming the appellees as scabs was literally and factually true"). Because I conclude that (1) the Air Line Pilots Association's ("ALPA") allegation that they were scabs was false and (2) a jury could find for either party on the issue of actual malice, I would hold that the district court erred in granting appellees summary judgment on appellants' libel claim.[2] I, therefore, respectfully dissent.[3]

## I.

The Air Line Pilots Association ("ALPA") is a labor union that represents airline pilots from a number of commercial airlines. Within each airline, ALPA operates through a Master Executive Council ("MEC"), a board of elected pilot representatives that makes union policy decisions relating to that airline.

On March 4, 1989, the MEC at Eastern Airlines decided that Eastern's pilots should conduct a "sympathy strike" in conjunction with a strike against Eastern by the International Association of Machinists ("IAM").[4] Accordingly, the pilots were directed to stop working, and not to return to work until such time

---

[2]I agree with the majority, however, that the libel claim of appellant Joseph S. Norman, II is insufficient as a matter of law. Hence, in referring to appellants I exclude Norman.

[3]I concur in the majority's affirmance of the district court's dismissal of appellants' claim, under Fed.R.Civ.P. 12(b)(6), that ALPA tortiously interfered with appellants' business relationships with other airlines.

[4]A "sympathy strike" occurs when members of a union stop working to show support for another union that has a grievance with management. *See NLRB v. Peter Cailler Kohler Swiss Chocolates Co., Inc.,* 130

24

as an agreement was reached between IAM and Eastern. The sympathy strike lasted until November 22, 1989, when the Eastern MEC voted to end the strike (despite the fact that the IAM strike had not ended) and directed the pilots to return to work.

After the conclusion of the sympathy strike, ALPA produced and distributed a publication titled "The Scabs of Eastern of the Strike of '89," which listed the more than two thousand pilots who allegedly refused to honor the strike and crossed the machinist union's picket lines to fly for Eastern. The appellants in this case are pilots who were on this list. They brought suit against ALPA,[5] alleging, *inter alia,* that the publication of the list constituted libel. The district court disposed of the libel claim on summary judgment, concluding that the pilots had not shown that the "scab" allegation was false, as required by law.

II.

The majority, purporting to follow the Supreme Court's reasoning in *Letter Carriers,* concludes that ALPA's statement that appellants were scabs was factually true; and thus, the district court did not err in granting appellees summary judgment. The majority, however, follows the Court's reasoning in *Letter Carriers* in form rather than substance. As in *Letter Carriers,* this case involves a union calling people who oppose it scabs. Unlike *Letter Carriers,* however, the pilots that crossed the picket lines were not scabs.[6] For

_____

F.2d 503, 505-06 (2d Cir.1942).

[5]The appellants also sued certain individual executives in ALPA and in the Eastern MEC. I refer to all of the defendants/appellees as "ALPA."

[6]According to Webster's, a "scab" is "(1): one who refuses to join a union (2): a member of a union who refuses to strike or returns to work before a strike has ended (3): a worker who accepts employment or replaces a union worker during a strike (4): one who works for lower wages than or under conditions contrary to those prescribed by a union." *See Webster's Third New International Dictionary* 2022 (1993); *see also ante* at 210 n. 7.

The Court in *Letter Carriers* found the scab designation true because the appellants refused to join the National Association of Letter Carriers, and refusing to join a union is one definition of scab. *See Letter Carriers,* 418 U.S. at 283, 94 S.Ct. at 2780. In this case, the only possible definition of scab ALPA could have intended to apply to appellants was that they worked during a union strike. As discussed below, appellants did not violate a legal union strike, therefore, the allegation that they were scabs is false.

25

ALPA's statement (that appellants were scabs) to be true, two conditions had to be met: (1) appellants worked for Eastern and (2) they did so while ALPA was on strike. It is undisputed that appellants flew for Eastern. Because ALPA was never legally on strike, however, appellants did not work during a union strike. Thus, the statement that they worked during a union strike, therefore were scabs, was false.

A.

To succeed on a defamation claim based on statements made during a labor dispute, a plaintiff must show falsity and actual malice. A statement is false if it produces a different effect on the mind of the reasonable reader than would the truth. *See Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 517, 111 S.Ct. 2419, 2432-33, 115 L.Ed.2d 447 (1991). "Minor inaccuracies" do not make a statement false. *Id.,* 111 S.Ct. at 2433. The statement in question here is that appellants were "scabs." To determine if this statement was false, we thus look at whether a "reasonable reader"[7] would have thought that ALPA, by calling appellants scabs, meant that they were people who worked during a union strike; or only meant to engage in rhetorical hyperbole, suggesting in a general sense that appellants were bad people. I agree with the majority's answer to this question—ALPA meant literally that appellants were people who worked during a union strike.

I cannot, however, agree with the majority's conclusion that ALPA's scab allegation was true. The reasonable reader analysis dictated by *Masson* ends with the statement that appellants were scabs; it does not extend to determining whether ALPA was on strike. Yes, appellants can only be scabs if ALPA was on strike. But, we do not inquire whether ALPA was on strike based on the reasonable reader's perception. Rather, we determine whether a union was on strike by looking to the rules that the union established for itself in its constitution and by-laws.[8] If these rules were not followed, the union was not on strike. The majority

---

[7]Reasonable reader is a standard in defamation cases, such as a reasonable person is a standard in negligence cases. I do not, therefore, quote the term in the remainder of this opinion.

[8]The majority today turns labor law on its head by finding that courts, when determining if a strike occurred, are not to look at whether a union followed the rules and procedures contained in its constitution

26

at various times calls this approach "highly, formalistic, legal analysis" and "technical [and] legalistic." *See ante* at 209. I agree. But the fact of the matter is that ALPA's Constitution and By-laws set forth the requirements ALPA had to follow in order to call its sympathy strike. ALPA did not follow its own rules; therefore, ALPA was not legally on strike, and its allegation that appellants were scabs, i.e., people who worked during a union strike, was false.

1.

Article I of the ALPA Constitution and By-Laws states: "[w]hen a suspension or withdrawal of service is called for ..., the members will be balloted before such action may be taken." The procedures for calling a strike are spelled out in more detail in Article IV, which states:

> The approval by a majority vote of the Master Executive Council of an airline, with the advice of the President [of ALPA], is mandatory before a strike vote of the members of an airline may be taken. This membership strike vote shall be by secret ballot.... A simple majority of valid ballots returned shall govern.

Reading these provisions together, it appears indisputable that the ALPA Constitution and By-Laws requires a vote of the membership before a strike may be called.

ALPA, however, provides us with two alternative readings of these provisions. The first is that they are discretionary—in other words, they detail the procedures to be followed if a strike vote is taken, but do not mandate that such a vote be taken before a strike is called. While this approach may be plausible as to the Article IV provision, it is entirely incompatible with Article I, which states that "members *will* be balloted" (emphasis added) before a strike is called. Second, ALPA suggests, and the majority agrees, that the voting provisions in the Constitution and By-Laws apply only to primary strikes, and not to sympathy strikes. This interpretation is simply ridiculous. As an initial matter, this interpretation strains the English

and by-laws. Rather, courts are to look at whether a reasonable reader would perceive that the union was on strike. In other words, union leaders can call strikes on their own initiative regardless of their constitution's requirement of majority vote, and the strike will be "true" as long as people perceive it as such. Disregarding the fact that such an oligarchical practice contradicts the primary purpose of unions—democratizing the workplace—the majority, with a straight face, declares that courts are not to consider the "strictly legalistic or literal interpretation" of the word strike. *See ante* at 209. Why a United States Court of Appeals should not be legalistic is unclear to me. Should a forest have no trees?

27

language;  under ordinary rules of grammar, where a noun is left unqualified, it applies without qualification.

For example, if a person says that "the cars in the fire lane are illegally parked," we can safely assume that he is referring to all of the cars in the fire lane.  It would be nonsense for him later to claim that he was referring only to the blue cars, and not the green ones.  Nothing in the text or context of the statement suggests that "cars" applies only to cars of a certain color.  Likewise, there is nothing in the text of the Constitution and By-Laws that distinguishes among types of strikes—understandably so, given that a strike has the same impact on labor and management regardless of the reason why it is called—and it is therefore unreasonable for ALPA now to claim that the strike provisions in its Constitution and By-Laws refer only to primary strikes.  Furthermore, if a union were to distinguish between the two types of strikes, it would be far more logical to require a membership vote for a sympathy strike than for a primary strike:  whereas workers may benefit directly from a primary strike (through a renegotiated contract), the only benefits they could gain through a sympathy strike would be indirect and speculative.  Therefore, even if substantial deference is afforded ALPA's interpretation of its own governing documents, *see Dow v. United Bhd. of Carpenters and Joiners of Am.,* 1 F.3d 56, 58 (1st Cir.1993), a membership vote was required before a strike could commence.[9]  Because no such vote was taken,[10] the strike was invalid.

2.

---

[9]The majority points out that, for over thirty years, ALPA has interpreted its Constitution and By-Laws as not requiring a membership vote for a sympathy strike.  This tells us merely that ALPA's interpretation has been consistent, not that it is reasonable.  Equally irrelevant to the question of the legality of the strike is the fact that ALPA's interpretation is included in ALPA's Administrative Manual;  the ALPA Board of Directors (the author of the manual) has the power to *interpret* and *apply* the ALPA Constitution, but not to *ignore* it. Otherwise, the Constitution and By-Laws would be no more than default provisions, subject to revision at the whim of the Board of Directors.

[10]ALPA members were polled two weeks prior to the strike declaration to see whether they would honor an IAM picket line.  This was clearly an attempt by ALPA to gauge the feelings of its members;  it was not—as ALPA properly concedes—the equivalent of a membership vote on whether ALPA should strike. The significance of this poll is discussed at greater length in part II.B.1, *infra.*

Appellees argue that the strike was legal even though not properly authorized because the pilots of Eastern did in fact engage in a strike in which the appellants did not participate. This argument, however, fails adequately to account for the context in which the "scab" allegation is being made. It is true that in the context of an ordinary wildcat strike (in which a group of workers decides on its own to stop work), the charge of "scab" made by a striking worker to another worker who does not join the strike may well be accurate despite the lack of official union authorization. This case, however, presents a very different situation. In this case, we must assume that ALPA intended, through the publication of the scab list, to convey that its strike was legal. A contrary assumption would mean that ALPA published a list of all the pilots who worked during a strike it illegally ordered. Although it is theoretically possible that ALPA wanted to convey such a message, it is highly unlikely, for such a message would only harm the union.

Further, the scab list was distributed to pilots at other airlines and was—by ALPA's own admission—intended to make it difficult for the named pilots to obtain employment with other airlines. If the strike was illegally called, pilots' inclusion on the scab list would provide no basis for denying them employment. On the contrary, a pilot's refusal to participate in an illegal strike, called by union bosses acting outside the scope of their authority, would make the pilot a more attractive candidate for employment. Inclusion on the scab list would in no way demean the character of the persons so included, but would instead be a badge of honor.

Thus, in the context of this case, the scab allegation makes sense only if the strike was legally called, because only then would inclusion on the scab list carry a negative connotation. It was therefore a necessary assumption of the persons reading the scab list that the strike was legally called. This assumption was buttressed by the fact that the scabbing charge was being made by the union, in a publication distributed by the union pursuant to a formal union resolution.[11] Under those circumstances, a reasonable reader

_____

[11]On March 29, 1989—about four weeks after the beginning of the strike—the Eastern MEC unanimously resolved "to publish a finalized list of strike-breaking pilots at the conclusion of the ALPA sympathy strike" and "to bring Article VIII charges against all strike-breakers in accordance with [the] ALPA

29

undoubtedly would assume that the persons on the scab list had refused to participate in a valid, union-authorized strike. This assumption, however, was false. As demonstrated in the preceding section, the strike was not called in accordance with the union's Constitution and By-laws, and was therefore invalid. Consequently, the scab allegation was false, and the appellants have established the falsity element of their libel claim.

### B.

In addition to showing that the scab allegation was false, the appellants, to succeed on their libel claim, also must show that the allegation was made with actual malice—in other words, that the allegation was made knowing that it was false, or with reckless disregard as to its accuracy. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964); *Letter Carriers,* 418 U.S. at 281-82, 94 S.Ct. at 2779-80 (extending the *New York Times* framework to statements made during labor disputes). "Reckless disregard," in this context, means that the defendant made the allegation despite "entertain[ing] serious doubts as to the truth" thereof. *St. Amant v. Thompson,* 390 U.S. 727, 730-31, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). In this case, there are two different theories—one argued by all appellants and one only argued by the Group I appellants—concerning how ALPA acted with actual malice. Each theory is discussed in this section.

### 1.

The appellants' first theory is that ALPA acted with malice because it knew that the strike was illegally called, or at least had substantial doubts regarding the legality of the strike, when it published the scab list. ALPA, in response, maintains that it genuinely and without a doubt believed that no membership

---

Constitution and By-Laws." Article VIII of the ALPA Constitution and By-Laws outlines the procedures for disciplinary actions by the union against its members and the grounds on which such actions may be brought. Under Article VIII, any member may be disciplined, fined, or expelled for working during an ALPA strike. ALPA's Administrative Manual further explains that any ALPA member who "participates in strikebreaking by actually flying the airplanes of an airline on a *legal* ALPA-sanctioned strike shall be automatically expelled from membership in ALPA." *ALPA Administrative Manual* § 65-12, at 271 (1993) (emphasis added).

30

vote was needed for a sympathy strike, and thus believed that the individuals on the scab list were in fact scabs.[12] In support of its position, ALPA points to its long-standing administrative policy of not taking a membership vote prior to calling a sympathy strike, and to the testimony of ALPA officials that they believed the strike was properly authorized.[13]

The appellants, meanwhile, contend that under the circumstances it is highly improbable that ALPA actually believed—at least without serious doubts—that it had the power to call a strike without taking a vote of the membership. *See generally Hunt v. Marchetti,* 824 F.2d 916, 919 (11th Cir.1987) (noting that malice may be inferred from circumstantial and indirect evidence). Four arguments support their contention.

First, the appellants point out that the requirement of a membership vote is patently evident from ALPA's own Constitution and By-Laws. Assuming, therefore, that the ALPA leadership read its own Constitution, it must have known that a vote was required. This seems a fair assumption considering the substantial legal significance given to voting rights contained in a union's Constitution and By-laws. Federal law provides a cause of action against a union for denying a member the right to vote, if the right to vote is contained in the union's Constitution and By-laws. *See* 29 U.S.C. § 411(a)(1) (1994); *Christopher v. Safeway Stores, Inc.,* 644 F.2d 467, 470 (5th Cir. Unit A May 1981). ALPA is no stranger to this cause of action; it has been sued on the basis of federal voting rights requirements on numerous occasions, both before and after the events giving rise to this lawsuit. *See, e.g., Michelotti v. Air Line Pilots Ass'n,* 61 F.3d 13, 14 (7th Cir.1995); *O'Neill v. Air Line Pilots Ass'n, Int'l,* 886 F.2d 1438, 1447-48 (5th Cir.1989), *rev'd on other grounds,* 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); *Klemens v. Air Line Pilots Ass'n, Int'l,* 736 F.2d 491, 495 (9th Cir.1984). Further, state law generally provides for a breach of contract action when a

---

[12]When I speak of what ALPA "believed," I am referring to the beliefs of the ALPA officials responsible for the publication of the scab list. *See New York Times Co.,* 376 U.S. at 287, 84 S.Ct. at 730.

[13]The majority apparently finds this evidence to be credible, and therefore concludes that ALPA did not act with malice. There is, however, substantial evidence (discussed later in this subsection) that ALPA, despite its assertions to the contrary, knew that the strike was invalidly called. The weighing of conflicting evidence is a matter within the province of the jury, not this court.

31

union violates the terms of its Constitution and By-laws. *See International Ass'n of Machinists v. Gonzales,* 356 U.S. 617, 618-19, 78 S.Ct. 923, 924, 2 L.Ed.2d 1018 (1958). Finally, and more generally, federal law imposes a "duty of fair representation" on unions that requires them always to act in their members' best interests, *see Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 74-76, 111 S.Ct. 1127, 1133-34, 113 L.Ed.2d 51 (1991); such a duty suggests that unions are expected to be aware of their constitutional obligations to their members. These obligations include, I submit, the duty not to defame as "scabs" members who refused to participate in an illegal strike. In light of this body of law—and ALPA's known familiarity with it—it would be difficult for ALPA to claim that it was unfamiliar with the voting requirements contained in its own Constitution and By-Laws, or that it honestly thought it could ignore the requirements of the Constitution and By-Laws on the basis of its internal administrative policies.

Second, the idea that the union leadership would not be required to poll the membership before calling a strike is so implausible that it seems unlikely that ALPA actually believed it. *See Hunt v. Liberty Lobby,* 720 F.2d 631, 643-46 (11th Cir.1983) (stating that implausibility may be evidence of actual malice). It is hard to imagine an organizing campaign in which the union leaders say to the workers, "come join our union, and we'll decide whether you should work or strike, without asking you." Such an approach would deprive workers of any direct input into the most important decision that a union makes. Furthermore, such a system would contain an enormous potential for corruption: management could avert a strike simply by bribing a few individuals, without having to respond to the demands of the union membership as a whole. (Conversely, those same individuals could threaten a strike—regardless of the sentiment of the membership as a whole—in order to obtain a bribe from management.)[14]

Third, an opinion poll taken by ALPA two weeks prior to calling the strike suggests that ALPA had serious doubts regarding its power to call a strike unilaterally. The poll consisted of questionnaires sent to

---

[14]The idea of concentrating so much power in the hands of a few individuals recalls Lord Acton's oft quoted phrase, "[p]ower tends to corrupt and absolute power corrupts absolutely." John Bartlett, *Familiar Quotations* 615 (15th ed.1980).

32

all Eastern ALPA members asking them to choose among the following options: (1) "I would honor an IAM picket line at EAL"; (2) "I would not honor an IAM picket line at EAL"; or (3) "My elected MEC representatives are best qualified to make this decision, if and when an IAM strike occurs, and I will abide by their decision." The inclusion of the third option is telling: if ALPA officials were confident of their constitutional power to call a strike without taking a membership vote, they would, at most, ask ALPA members to choose between the first two options in order to gauge the feelings of the membership prior to making their decision. The availability of the third option could lead a reasonable jury to conclude that ALPA knew (or at least suspected) that it could not call a strike on its own, and that the purpose of the poll was to encourage the members to abdicate their voting rights.

Finally, ALPA's lack of investigation may suggest actual malice. When there is no pressing need for immediate publication of a defamatory allegation, actual malice may be inferred if the investigation given to the allegation is grossly inadequate under the circumstances. *See Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 692-93, 109 S.Ct. 2678, 2698-99, 105 L.Ed.2d 562 (1989); *Vandenburg v. Newsweek, Inc.,* 441 F.2d 378, 380 (5th Cir.1971).[15] In this case, the allegation is very serious—ALPA officials believed (and hoped) that by labeling the appellants "scabs," they would permanently prevent them from obtaining employment with a commercial airline. *See infra* note 25. Under those circumstances, and given the union's duty of fair representation, the union must conduct a substantial investigation before it decides whether to distribute a scab list. Although ALPA thoroughly researched whether the listed individuals actually crossed the IAM picket lines, there is no evidence that it investigated the more foundational question of whether its Constitution and By-laws required a membership vote prior to calling a sympathy strike. For instance, there is no evidence that ALPA consulted counsel for a legal opinion

---

[15]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

regarding its authority to call a sympathy strike without a vote of the membership.[16]  In the absence of such

evidence, a jury reasonably could infer that ALPA made the scab allegation with serious doubts as to its

accuracy.

In sum, under this theory, a reasonable jury could find for either side on the issue of malice.  The

district court therefore erred in granting summary judgment and substituting its judgment for that of a jury.

2.

Even if the scab allegation was not made with malice as to all of the pilots (because ALPA actually

and non-recklessly believed that the strike had been called in accordance with the ALPA Constitution and

By-Laws), it may nevertheless have been made with malice as to a subset of the pilots.  On August 6,

1989—five months after the beginning of the strike—the Eastern MEC called a meeting of all Eastern ALPA

members to discuss the union's course of action.[17]  At the meeting, the chairman of the Eastern MEC, Captain

Jack Bavis, said that the striking pilots should return to work.  Within the next few days, several of the

appellants—known as the "Group I" pilots—returned to work for Eastern.[18]  Union officials other than Bavis

subsequently announced that the strike was still ongoing, and ALPA did not formally conclude the strike until

November 22.  The Group I pilots were therefore included on the scab list.

---

[16]Had ALPA so inquired, its attorney may well have concluded that any reading of the agreement that allowed union officials to call a strike without a membership vote would be void as against public policy, because such an interpretation would create an environment in which corruption would be likely to occur. Indeed, it was in response to such concerns that Congress passed the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 401-531 (1994)—which, as discussed above, protects the rights of union members to vote on union business when such a right is contained in the union's Constitution and By-laws.  The LMRDA reflects a federal policy favoring democratic conduct of union activity, out of a recognition that the tremendous power given to labor unions under federal law must be accompanied by democratic safeguards to prevent corruption. *See NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 180-81, 87 S.Ct. 2001, 2006-07, 18 L.Ed.2d 1123 (1967).  In the words of Archibald Cox, a key participant in the drafting of the LMRDA, "[a]n individual worker gains no human rights by substituting an autocratic union officialdom for the tyranny of the boss."  Archibald Cox, *The Role of Law in Preserving Union Democracy,* 72 Harv. L.Rev. 609, 610 (1959).

[17]The meeting was held in Miami and was broadcast to all other Eastern pilot bases.

[18]The remainder of the appellants either never joined the strike or ceased striking prior to August 6.

This sequence of events raises the possibility that the strike was officially concluded on August 6, 1989. If so, and if ALPA knew this when publishing the scab list, then ALPA acted with actual malice as to the Group I pilots—even if it believed that the strike had been legitimately called in the first instance. In this section, therefore, I discuss (a) whether the strike was in fact terminated on August 6, and, if so, (b) whether ALPA knew this to be the case (or acted with reckless disregard of the truth) when it accused the Group I pilots of being scabs.

a.

ALPA argues that the strike could not have been concluded by Bavis' August 6 remarks because Bavis did not have the authority to end the strike unilaterally; that decision had to be made by the president of ALPA and a vote of the entire MEC. ALPA may well be correct in this assertion;[19] however, Bavis' lack of actual authority to end the strike is irrelevant in light of his apparent authority to do so. *See North River Energy Corp. v. United Mine Workers of Am.,* 664 F.2d 1184, 1192 (11th Cir.1981) (noting that acts of a union agent on behalf of the union committed within the scope of the agent's apparent authority "bind the union, regardless of whether they were specifically authorized or ratified"). Apparent authority is "the authority a principal knowingly tolerates or allows an agent to assume, or which the principal by his actions or words holds the agent out as possessing." *Owen Indus., Inc. v. Taylor,* 354 So.2d 1259, 1261 (Fla. 2d DCA 1978). Bavis, as chairman of the Eastern MEC, undisputedly was an agent of ALPA. ALPA held Bavis out as possessing the authority to terminate the strike by placing the following sentence on the front page of the ALPA Pilots' Strike Manual: "*PLEASE KEEP IN MIND: A STRIKE ACTION WILL NOT BE CALLED OFF OR TERMINATED EXCEPT BY DIRECTION OF THE MEC CHAIRMAN.*" Consequently, Bavis had the apparent authority to end the strike.

---

[19]Although the ALPA Constitution and By-Laws is clear regarding how a strike is to be initiated, *see supra* part II.A.1, they appear to be silent on the topic of how a strike is to be concluded.

Given that Bavis had the apparent authority to end the strike, the next question is whether he exercised that authority. Bavis' exact words are unknown,[20] but the parties agree that he said that the striking pilots should return to work. ALPA maintains that Bavis was expressing his individual views in the context of a debate regarding the future of the strike. In support of its position, ALPA points to the fact that the meeting culminated in a vote in which the majority of the pilots voted to continue striking. ALPA also points to other statements made by Bavis during the meeting, such as his statement that he was "speaking just as Jack Bavis, the pilot" and his statement that "I'm not going to go back to work personally unless we all go back to work," as well as his affidavit that he never told the pilots to cross picket lines prior to November 22. Finally, ALPA points to certain communiqués issued subsequent to August 6—such as an August 11 letter to all Eastern pilots—in which it maintained that the strike was still ongoing.

The appellants, on the other hand, maintain that Bavis was announcing that the strike was over. In support of their position, they point to seventeen affidavits in which various Group I pilots state that ALPA terminated the strike on August 6, basing their conclusion on Bavis' statements. They also point to disciplinary charges brought against Bavis by ALPA that "Capt. Bavis did, on August 6, 1989, publicly advise the Eastern pilots to abandon their picket activities and to return to work at Eastern, accomplishing this traitorous act during a ... meeting to which the striking Eastern pilots were listening via a system wide audio transmission"—charges that are highly inconsistent with ALPA's present position that Bavis was merely exercising his First Amendment right to express his personal opinion in an open debate. In addition, they point to a statement in ALPA's official newsletter that "[i]n August 1989, ALPA National advised the Eastern pilots to go back to work."[21] Finally, the surrounding circumstances support the appellants' argument:

---

[20]No official recording of the pilots' meeting was made. Various pilots made unofficial recordings (some of which are in the record), but these recordings are incomplete or unintelligible in key places.

[21]Contrary to the majority's suggestion, *see ante* at 216 n. 19, the newsletter and the charges proffered by ALPA are highly probative circumstantial evidence as to what was said on August 6. By way of analogy, if the buyer of widgets gives the seller a check for $5000 following a meeting with the seller, the check is highly probative as to the what the parties said at the meeting regarding the purchase price. (I note that ALPA

36

given Bavis' apparent authority to end the strike, the desire of many pilots to return to work, and the severe consequences to the pilots of returning to work in violation of the strike, *see supra* note 11, other ALPA leaders at the meeting seemingly would have taken steps to clarify Bavis' remarks if they did not want them to be interpreted as authorization to return to work.

In sum, there is a genuine issue of material fact as to whether ALPA terminated the Eastern pilots' strike on August 6, 1989. If this issue is resolved against ALPA, then the Group I pilots are entitled to a jury determination on whether the scab allegation was made with actual malice, as I discuss in the next subsection.[22]

b.

ALPA acted maliciously in regard to the Group I pilots if it published the scab list knowing that (or with reckless disregard as to whether) Jack Bavis terminated the strike on August 6. In this regard, ALPA has presented testimony and post-August 6 communiqués from its own officials stating that it genuinely and non-recklessly believed Bavis did not terminate the strike and that the strike was continuing.[23] On the other hand, the appellants have presented substantial circumstantial evidence of actual malice—namely, that other

---

also submitted after-the-fact evidence to the district court—namely, the communiques discussed earlier—to support its position regarding what Bavis told the pilots on August 6.)

[22]Even if ALPA did not in fact terminate the strike on August 6, there may be another theory on which the Group I pilots can establish malice. In order for a worker to be a scab, he must know that his union is on strike. A worker who works in violation of a strike of which he is unaware is no more a "scab" than a military officer who unwittingly divulges security information is a "traitor"—both may be fools, but neither can be said to have engaged in an act of intentional betrayal. And, as the language quoted in note 1, *supra,* suggests, an allegation of scabbing necessarily implies betrayal or disloyalty. Thus, if the Group I pilots genuinely believed that their union was no longer on strike, then they could not accurately be described as scabs. Consequently, if ALPA knew that the Group I pilots believed that the strike ended on August 6, then it acted with malice. Because this theory of actual malice was not presented to the district court or to this court on appeal, however, I discuss it no further.

[23]The majority, as with the discussion of malice as to all of the pilots, *see supra* part II.B.1, finds ALPA's evidence to be credible and therefore concludes that ALPA did not act with malice. Again, however, in light of the contrary evidence discussed in the remainder of this paragraph, the weighing of the evidence is a matter for the jury, not the court. *See supra* note 13.

ALPA officials heard Bavis' statements, and therefore knew that the strike had been terminated when they published the scab list. In addition, the charges brought against Bavis by ALPA are compelling evidence that ALPA knew that he had terminated the strike. Also, because ALPA knew that many of the pilots returned to work in response to Bavis' statements, ALPA's failure to consider the practical effect of those statements prior to calling the pilots "scabs" may have constituted reckless disregard of the truth under the circumstances. In other words, if ALPA induced the Group I pilots to return to work, a jury could reasonably infer that ALPA at least had serious doubts when it then turned around and called those pilots "scabs." Finally, ALPA's lack of investigation into the effect of Bavis' statements suggest malice, as discussed in part II.B.1, *supra*.

A genuine issue of material fact exists regarding malice as to the Group I pilots. This is an additional reason (along with the theory of malice discussed in part II.B.1, *supra* ) why summary judgment was inappropriate.

C.

Finally, the appellants must establish that injury resulted from ALPA's publication of the scab list. Florida law recognizes certain types of libels as "libel per se," meaning that injury is presumed and the plaintiff need not present evidence on the issue. *See Briggs v. Brown,* 55 Fla. 417, 46 So. 325, 330 (1908). Under federal law, however, a libel action arising out of a labor dispute requires proof of injury, regardless of state libel law. *See Linn v. United Plant Guard Workers of Am., Local 114,* 383 U.S. 53, 64-65, 86 S.Ct. 657, 664, 15 L.Ed.2d 582 (1966); *Pantex Towing Corp. v. Glidewell,* 763 F.2d 1241, 1248 n. 7 (11th Cir.1985).[24]

The district court, in its order granting appellees' motion for summary judgment, expressly declined to reach the issue of injury. The court focused primarily on the truth of the scab allegation—and understandably so, since in a case of this magnitude, it is easier to decide the case on grounds (such as truth

---

[24]"Injury," however, may be defined broadly to include injury to reputation, mental suffering, and so forth. *See Linn,* 383 U.S. at 65, 86 S.Ct. at 664.

and malice) that apply to broad groups of plaintiffs, rather than on a ground (such as injury) that may involve an individualized inquiry into the circumstances of each plaintiff.[25]  Nevertheless, such an inquiry may be required in light of my earlier conclusions that the scab allegation is false and that there is a genuine issue of material fact as to actual malice.  This case, therefore, should properly be remanded for further proceedings on this issue.  I take no position on whether there is a genuine issue of material fact regarding injury.

III.

In conclusion, the appellants have established, as a matter of law, that the 1989 Eastern Airlines strike was illegally called and therefore ALPA's scab allegation was false.  They have presented sufficient evidence to create a jury issue as to whether the allegation was made with actual malice because ALPA knew (or acted with reckless disregard as to whether) the strike was illegal.  Even if the jury answered that question in the negative—in other words, if a jury found for ALPA on the issue of malice—the Group I pilots would nevertheless have a claim for libel.  A jury could find that (1) Captain Jack Bavis terminated the strike on August 6, 1989, and (2) ALPA published the scab list knowing this, or with reckless disregard as to whether the strike was so terminated.  I take no position on the third element of the appellants' claim, injury.

For the foregoing reasons, I respectfully dissent.

---

[25]Of course, certain evidence of injury is probative as to all appellants—for instance, an affidavit submitted by an economist which states that, out of the 2241 scab list pilots, only three found subsequent employment with a major commercial airline, whereas out of the 1146 non-listed pilots, 136 were able to find such employment.  In addition, the appellants' allegations of injury are supported by the fact that the whole purpose of publishing a scab list is to cause injury.  The possibility of being labeled a "scab" can encourage workers to participate in a strike only if the label harms the workers in some way.  *Cf. supra* note 11 (noting that ALPA resolved to publish a list of strike-breaking pilots at the conclusion of the strike, presumably as a means of preventing defections).  This is further confirmed in the present case by correspondence between ALPA and union members who were working during the strike, which includes claims like, "[a] scab who doesn't change his mind in time finds it very difficult to find a job with other carriers. It's not just other pilots who don't want to work with scabs. Even managements [sic] recognize that someone who doesn't understand loyalty does not make a reliable employee";  and "[i]f you crossed [the IAM picket lines] for a job, the job isn't going to last, and the next one could be hard to find."